**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEPHANIE L. TAYLOR, | ) | |
| | ) | CASE NO.  1:13CV222 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | **MEMORANDUM OPINION & ORDER** |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Stephanie L. Taylor ("Taylor ") challenges the final decision of the

Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42

U.S.C. § 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the

consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

**I.  Procedural History**

In 2002, when she was thirteen (13) years old, Taylor was awarded children's SSI

benefits based on mental retardation and attention deficit hyperactivity disorder ("ADHD").  (Tr.

52.)  When Taylor turned eighteen (18) years old, her eligibility for disability benefits was

redetermined pursuant to 20 C.F.R. § 416.987. (Tr. 16, 52.) On July 10, 2007, the Social

Security Administration ("SSA") found she was no longer disabled as of July 1, 2007. (Tr. 55.)

Taylor requested reconsideration. (Tr. 58.) On December 5, 2008, reconsideration was denied

based on the information in Taylor's file, after she failed to appear before the disability hearing

officer. (Tr. 59-67, 68-69, 318.)

On March 2, 2009, Taylor requested a hearing before an Administrative Law Judge

("ALJ"). (Tr. 70.) The ALJ convened a hearing on August 17, 2009, but postponed the matter

in order to allow Taylor the opportunity to obtain representation. (Tr. 314-325.) A second

hearing was convened on December 11, 2009, at which time Taylor again appeared without a

representative. (Tr. 291-313.) After Taylor stated that she wished to proceed, the ALJ heard

testimony from Taylor and an impartial vocational expert ("VE"). (Tr. 291-313.) After the

hearing, the ALJ requested medical interrogatories from medical expert ("ME") Carolee K.

Lesyk, Ph.D. (Tr. 16.) The interrogatories were completed on February 13, 2010 and submitted

into evidence. (Tr. 16, 283-290.) The interrogatories were also provided to Taylor, who

responded with written comments.[1] (Tr. 16.)

On May 10, 2010, the ALJ found Taylor was able to perform a significant number of

jobs in the national economy and, therefore, was not disabled. (Tr. 16-25.) The ALJ's decision

became final when the Appeals Council denied further review.[2] (Tr. 326-328.)

---

[1] Taylor states that her written comments (marked by the ALJ as Exhibit 14E) are missing from
the record. (Doc. No. 21 at 2.)

[2] Taylor states that, on August 30, 2010, while her appeal was pending before the Appeals
Council, she filed a second application for SSI disability benefits. (Doc. No. 21 at 3.) This
application was apparently denied by the Social Security Administration ("SSA") and a hearing
was thereafter held before a different ALJ on May 17, 2012. (Tr. 346- 393.) Taylor's August

## II.  Evidence

***Personal and Vocational Evidence***

Age twenty (20) at the time of her administrative hearing, Taylor is a "younger" person under social security regulations.  *See* 20 C.F.R. § 416.963(c); Tr. 300.  She took special education classes and graduated from high school.  (Tr. 300-301.)  She has no past relevant work. (Tr. 23.)

***Hearing Testimony***

At her August 17, 2009 hearing, Taylor testified to the following:

- She used to live with her mother, but was "kicked out." For awhile, she was "moving place to place to place."  She now lives alone.  (Tr. 318.)

- Her mother used to be her payee, but "things were bad" because her mother did not "do the responsible things with that check."  Her payee is now an organization called All Central, which handles her bills for her.  (Tr. 317.)

- When her mother was her payee, she was taken to the doctor and found to have a disability.  Since she moved out, she has been trying to look for doctors but "couldn't because it's hard." (Tr. 319.)

- After the Social Security Administration determined she was not disabled, she did not appear before a disability hearing officer to contest that finding.  At the time, she had left her mother's house and was not receiving her mail.  (Tr. 318.)

- She did not understand the letter she received from the ALJ about her hearing. Her boyfriend's mother has been trying to help her understand the process.  (Tr. 317.)

The ALJ explained that Taylor had a right to a have a representative with her at the hearing, and

---

30, 2010 application was denied on June 15, 2012. (Doc. No. 21 at 3.)  She has requested review of the denial of this application by the Appeals Council.  *Id.*  As of the date of Taylor's Brief in this case, no action had yet been taken by the Appeals Council.  *Id.*  Although Taylor has included the transcript of the hearing before the ALJ with regard to her August 30, 2010 application, the Court will not consider it in the context of the instant action.

that this representative could be either a lawyer or a non-lawyer.  (Tr. 316-317.)  In addition, the

ALJ explained a representative could help her prepare for and participate in the hearing, and he

gave her a referral list of attorneys and organizations that might be able to assist her.  (Tr. 320-

323.)  Taylor affirmed she was interested in finding a representative.  (Tr. 324.)  The ALJ then

continued her case to allow her the opportunity to obtain representation.  (Tr. 320, 324.)

Taylor's second hearing was convened on December 11, 2009.  (Tr. 291-313.)  At this

hearing, she testified to the following:

- She tried to find a representative but was unable to reach any of the individuals or organizations on the referral list that had been provided by the ALJ.  She "kept on calling, calling, calling but nobody would answer."  (Tr. 293-294.)  She did not give up, but "I just – I guess there is a lot put on me right now."  (Tr. 294.)

- She wanted to go forward with her hearing without a representative.  (Tr. 294.)

- She graduated from high school.  All her classes were special education classes. (Tr. 300-301.)  She went to JVS but it "didn't work" because she did not understand "the things they were trying to tell her."  (Tr. 301.)  She has not looked into any vocational training.  (Tr. 305.)

- She has never been hired for a job.  (Tr. 298.)  She applied for a job at McDonald's and went to an interview but "didn't really understand what [the interviewer] was saying."  (Tr. 297-298.)  She did not get the job.  She also unsuccessfully applied for a job at Convenient Food Mart.  *Id.*

- She lives in an apartment with her boyfriend, who is "slow, like me."  He works at McDonald's.  (Tr. 298-299.)  During the day, she cleans the apartment, feeds the cat, changes the litter box, goes for walks, and goes to the store to look around.  (Tr. 299.)  She also plays video games on her boyfriend's computer.  (Tr. 301-302.)  She does not like to read.  (Tr. 302.)

- She has trouble sleeping because "there's things in my mind that keep[] on running and running and running in my head and it won't stop."  (Tr. 300.)

- She does not have a driver's license.  To get around, she takes the bus and the RTA.  (Tr. 301.)

- She never really made any friends.  She has difficulty getting along with people

4

because she says "stupid things" to them, including mean and hurtful things.  (Tr. 303.)  It makes her feel "jumpy and anxious" to be around other people.  (Tr. 303-304.)  She goes to church sometimes, but has trouble getting along with people there.  (Tr. 304.)

- She does not see her family very often.  Her mother and father "have done a lot of hurtful things" to her and it is difficult for her to see them.  (Tr. 304.)

- She cannot work because she is unable to concentrate.  (Tr. 297.)  She does not "understand what people are saying to me that much."  (Tr. 297.)  She has to keep active all the time because "everything just runs through my brain."  (Tr. 297.)  She explained that she does not think she is "stable enough" to work because "I don't think I could understand as like a normal person like you guys, I don't think I could understand the things that people tell me, like in a work environment I don't think I can, I really don't.  I would love to try, I will love to, but I don't think I'm stable enough because I do not understand the things that original people do." (Tr. 305.)

The ALJ then posed the following hypothetical to the VE:

Okay.  Now, based on my own review of the record, I've determined that she has no past relevant work.  That she has – she's 20 years old with a high school education and a diploma.  However, she was also in special education.  With that I have a hypothetical question I want to ask you.  I want you to assume a hypothetical individual with the same age and education and no past work such as the claimant.  I'd like you to further assume this individual is able to perform a full range of exertional work.  However, they are limited to understanding, remembering and carrying out simple instructions and performing repetitive tasks throughout the work day.  Okay.  Now, would there be any unskilled occupations that such an individual could perform that exist in the national, regional or local economy?

(Tr. 308.)  The VE testified such a hypothetical individual would be able to perform light, unskilled work as a bench assembler (880 locally, 310,000 nationally); cashier (1,100 locally, 380,000 nationally); and, housekeeper (640 locally, 190,000 nationally).  (Tr. 308-309.)

The ALJ then added to the above hypothetical that "the person is only able to superficially interact with others throughout the work day."  (Tr. 309.)  The VE testified such a limitation would eliminate the cashier job.  (Tr. 309.)  However, he noted that, in addition to the bench

5

assembler and housekeeper jobs, the hypothetical individual could perform medium, unskilled work as a dish washer (970 locally, 240,000 nationally).  (Tr. 309.)

The ALJ then asked the VE:

Q:  Okay.  If I were to — what I'm looking for here is almost to state in terms of within the confines of my hypothetical but the simplest occupation existing in the national economy, if I reduced it to no more than say one or two steps of instruction and routine work is there any occupation that you can identify that would be even simpler than these?

A:  No, there you're getting into what would be GED levels of 1/1/1 and there's not many of those.  There would be something like very heavy construction worker or laborer or trash collector for a city environment, jobs like that.  There would be work but there are very few that would be that simple.

Q:  Okay.  And if I were to add to my hypothetical that the person would need a job coach throughout the work day would that eliminate competitive employment?

A:  Yes, it would, sir.

(Tr. 309-310.)

### Medical Expert

After the hearing, the ALJ requested interrogatories from medical expert ("ME") Carolee K. Lesyk, Ph.D.  (Tr. 16.)  These interrogatories were completed on February 13, 2010 and submitted into evidence.  (Tr. 16.)  After reviewing Taylor's file, Dr. Lesyk opined she could perform simple, routine work.  (Tr. 287.)  She found Taylor had a mild restriction in her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and, no episodes of decompensation.  (Tr. 284.)  Dr. Lesyk further offered Taylor was mildly impaired in her abilities to understand, remember, and carry out simple instructions; make judgments on simple work-related decision; and, interact

6

appropriately with the public, supervisors, and co-workers.  (Tr. 288-289.)   Finally, she felt

Taylor was moderately impaired in her abilities to understand, remember and carry out complex

instructions; make judgments on complex work-related decisions; and, respond appropriately to

usual work situations and to changes in a routine work setting.  (Tr. 289.)

## II.  Standard for Disability

A disabled claimant may be entitled to receive SSI benefits.[3]  20 C.F.R. § 416.905; *Kirk v.*

*Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a

claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

416.1201.  The entire process entails a five-step analysis as follows: First, the claimant must not

be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe

impairment."  A "severe impairment" is one which "significantly limits ... physical or mental

ability to do basic work activities."  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the

impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404,

Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work

experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's

---

[3]  When a child who is receiving SSI attains 18 years of age, the Social Security Administration
("SSA") reviews the transition to adult SSI by applying a slightly modified version of the five
step sequential evaluation set forth in 20 C.F.R. § 416.920.  *See e.g.  Wagner v. Comm'r of
Soc. Sec.*, 2010 WL 3036763 at * 3 (N.D. Ohio July 15, 2010); *Tucker v. Comm'r of Soc. Sec.*,
2013 WL 5304090 at * 3, fn 1 (E.D. Mich. Sept. 19, 2013).  As noted by the ALJ herein (Tr.
17), instead of commencing with whether the claimant is engaged in substantial gainful work
activity, a redetermination evaluation begins with the question of whether the claimant suffers
from a severe impairment or combination of impairments that has lasted or is expected to last
for a continuous period of at least twelve months.  *See* 20 C.F.R. §§ 416.987(b) & 416.920(C);
*Wagner,* 2010 WL 3036763 at * 3, n 5; *Tucker,* 2013 WL 5304090 at * 3, fn. 1.  The
remaining steps of the sequential evaluation remain the same.

impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ found Taylor established medically determinable, severe impairments, due to ADHD, psychotic disorder, and borderline intellectual functioning; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 18-20.) Taylor was determined to have a Residual Functional Capacity ("RFC") for the full range of work at all exertional levels but with certain nonexertional limitations. (Tr. 20.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Taylor was not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*,

8

25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th

9

Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### Failure to Adequately Develop the Record or Assist Claimant at the Hearing

Taylor argues the ALJ should have made a greater effort to develop the record and assist her at the hearing in light of the fact that she was unrepresented; had been receiving SSI benefits since age 13 based on mental retardation and ADHD; and, was clearly confused.  She notes the hearing lasted only 35 minutes and the ALJ's questioning of her comprised only eight pages of the transcript.  She maintains that "[m]ore important than the length of time was the limited amount of help the ALJ gave [her]."  (Doc. No. 21 at 5.)  She argues the ALJ asked her "only the most general questions about why she thought she could not work and did not mention the reasons why he might find claimant's testimony less than credible."  (Doc. No. 21 at 5.)  Taylor argues she was "helpless" and "overwhelmed" and that this should have been apparent to the ALJ.

The Commissioner argues the ALJ fulfilled his duty by thoroughly explaining the benefits of obtaining representation to Taylor; providing a referral list of potential representatives; and, continuing the matter for three months to allow Taylor sufficient opportunity to obtain representation.  (Doc. No. 22 at 13.)  She maintains Taylor's functional limitations "were not severe enough to prevent her from securing representation if so desired," citing evidence Taylor

babysat her two young nieces every day for ten hours, sought other employment, attended church, maintained her household with regular cleaning, and, could get home from the mall in time for her babysitting job.  (Doc. No. 22 at 13-14.)

Although the ALJ is responsible for ensuring a claimant has a full and fair hearing, "the claimant has the ultimate burden of producing sufficient evidence to show the existence of a disability." *Allison v. Apfel*, 2000 WL 1276950 at * 5 (6th Cir. Aug. 30, 2000).  *See also Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant."); *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. May 29, 2008); *Struthers v. Comm'r of Soc. Sec.*, 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment.").

That being said, the Sixth Circuit has made it clear that an ALJ has a special, heightened duty to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures."  *Wilson*, 280 Fed. Appx. at 459 (*citing Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)).  To satisfy this duty, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Lashley*. 708 F.2d at 1052.  As another court within this district has explained, "[t]he 'special duty' rule articulated in *Lashley* and confirmed in *Wilson* is primarily a rule that requires extra effort and care from ALJs in their administrative courtrooms.  ALJs are meant to carry out their special duty so that the inquisitorial

11

hearings that they conduct are always fair and determinedly truth-seeking." *Morgan v. Astrue*, 2010 WL 3723992 at * 8 (E.D. Tenn. June 30, 2010), *adopted by* 2010 WL 3723985 (E.D. Tenn. Sept. 15, 2010).

Although ALJs must be mindful of this heightened duty, the Sixth Circuit "did not intend to impose a duty on ALJs to serve as a *pro se* claimant's investigator, researcher, records custodian, or advocate outside of the courtroom." *Morgan v. Astrue*, 2010 WL 3723992 at * 8 (E.D. Tenn. June 30, 2010), *adopted by* 2010 WL 3723985 (E.D. Tenn. Sept. 15, 2010); *Lashley*, 708 F.2d at 1051 ("the administrative law judge must not become a partisan and assume the role of counsel"). Moreover, the mere fact that a claimant is unrepresented is not grounds for reversal. *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); *Kidd v. Comm'r of Soc. Sec.*, 2008 WL 2564784 at * 8 (6th Cir. June 25, 2008). Rather, district courts are instructed to "examine each case on its own merits to determine whether the ALJ failed to fully develop the record and therefore denied the claimant a full and fair hearing." *Duncan*, 801 F.2d at 856.

Taylor suggests the ALJ failed to adequately advise her of her right to representation and, further, that her waiver of this right was "insufficient."[4] (Doc. No. 21 at 5.) The Court rejects these arguments. While claimants seeking disability benefits have a statutory and regulatory right to legal representation at administrative hearings, this right is not of constitutional magnitude. *See Vaca v. Comm'r of Soc. Sec.*, 2010 WL 821656 at * 5 (W.D. Mich. March 4, 2010); *Ortiz v. Comm'r of Soc. Sec.*, 2010 WL 2927179 at * 5 (N.D. Ohio July 6, 2010). All that is required is that an ALJ inform a disability claimant of her right to counsel and ensure that any waiver of this

---

[4] The Court notes Taylor is currently represented by an attorney, who filed both a Brief on the Merits and a Reply Brief on her behalf. (Doc. Nos. 21, 24.)

right is made knowingly and voluntarily. *See Duncan*, 801 F.2d at 855 (finding that "it is clear that Duncan was aware of his right to counsel and that he voluntarily waived that right. Under these circumstances, the ALJ had no further duty to discuss Duncan's right to representation"). *See also Johnson v. Comm'r of Soc. Sec.*, 2004 WL 957815 at * 2 (6th Cir. April 29, 2004); *Allison*, 2000 WL 1276950 at * 5; *Vaca*, 2010 WL 821656 at * 5; *Ortiz*, 2010 WL 2927179 at * 5.

Here, the ALJ thoroughly and clearly explained to Taylor that she had the right to a representative at the hearing. Prior to the August 2009 hearing, the ALJ sent Taylor a letter that explained the issues he would be considering and informed her of her right to a representative. (Tr. 34-37.) When Taylor appeared at the August 17, 2009 hearing without a representative, the ALJ advised her as follows: "You have a right to have an attorney or somebody who is not an attorney come and help you with your case, all right, and represent you with regard to your appeal. Did you know that you had a right to have a lawyer?" (Tr. 317.) Taylor indicated she "really couldn't understand" the letter she had received. (Tr. 317.) The ALJ then explained to her, at length, the status of her redetermination review and the benefits of obtaining a representative in relation to developing her medical records and assisting her at the hearing.[5] (Tr. 318-323.) He also discussed attorney fee limits; explained there were organizations that provided assistance for no fee; and, gave her a referral list to help her obtain representation. (Tr. 322-323.) The ALJ then continued the case, noting "you probably won't get your hearing scheduled until at

---

[5] Specifically, the ALJ stated that: "The first thing that I would suggest you do is figure out whether you can get someone to represent you and whether you want to have someone represent you. Because if you get a representative they'll take care of all of this for you, they'll look through the file, they'll see if there's anything else that you can present in your case. They'll help you with all of that, okay. So, that's probably the first thing that you should do." (Tr. 320-321.)

least October or November at the very earliest. So that should give you at least two or three months or so to try to get a representative." (Tr. 324.) He further instructed Taylor that "[if] at that time, you don't have a representative, we'll just go ahead and go forward with your hearing at that time." (Tr. 324.)

The second hearing was not convened until almost four months later, on December 11, 2009. Taylor appeared *pro se*, and indicated she had been unsuccessful in obtaining a representative because nobody on the referral list answered the phone and "there is a lot put on me right now." (Tr. 293-294.) The following exchange then occurred:

> ALJ: Okay. So do you want to go ahead with your hearing today?
>
> CLMT: Yeah.
>
> ALJ: All right. All right, I'm just going to ask you to sign the form there, can you read okay? Do you have problems reading or do you want me to read that for you or can you read it?
>
> CLMT: No, I– you know, on the [Nord] Center file he recent diagnosed with me with something and he said that I wasn't wearing my glasses. Well, I can read up close but when I go far away I can't read so I'm just going to read it and see what it says from up close.
>
> * * *
>
> ALJ: Okay. So, all the form basically says is that I've explained to you that you have a right to have a representative and that you've chosen to go ahead and have your hearing today. Did you have any questions for me about the form at all?
>
> CLMT: No.
>
> ALJ: Okay. So we're going to go ahead with your hearing then.

(Tr. 294-295.)

Based on the above, the Court finds the ALJ fully advised Taylor of her right to

representation.  He clearly explained to Taylor her right to a representative; the benefits of

obtaining a representative; and, provided her with a referral list to assist her in this regard.

Although Taylor indicated she had had difficulty understanding the letter she had received prior

to the hearing, the transcript does not suggest (and Taylor does not argue) that she failed to

comprehend the ALJ's oral explanation of this issue.  Indeed, Taylor does not identify any

specific deficiencies in the ALJ's handling of this issue and, upon careful examination of the

record, the Courts finds none.

In addition, the Court rejects Taylor's argument that the waiver form was "insufficient."

(Doc. No. 21 at 5.)  As an initial matter, Taylor fails to identify how the waiver form was

"insufficient" or otherwise provide any meaningful argument demonstrating her waiver was not

knowing or voluntary.  The ALJ asked Taylor whether she wished to proceed and Taylor

responded, unequivocally, in the affirmative.  He inquired whether she could read the form and,

even though she stated she could, the ALJ nevertheless explained the meaning of the form and

asked if she had any questions.  Taylor responded "no" and signed the form.  Although the

record reflects Taylor had limited intelligence and "a lot put on her right now," there is no

indication she failed to understand the waiver form, or that she did not wish to proceed in the

absence of a representative.  Taylor's arguments are without merit.

Taylor also suggests the ALJ failed to fully develop the record because he asked "only the

most general questions" about her disability and "did not mention the reasons why he might find

[her] testimony less than credible." (Doc. No. 21 at 5.)  As noted above, an ALJ is required to

"develop the factual record fully and fairly" and to conduct a "full inquiry."  *Johnson v. Sec'y of*

*Health & Human Servs*., 794 F.2d 1106, 1111 (6th Cir. 1986); *Landsaw*, 803 F.2d at 214.  Where

15

an ALJ conducts superficial or perfunctory questioning on important issues, courts have found a failure to fully develop the record.  *See e.g. Lashley*, 708 F.2d at 1052 (where the claimant "was only superficially questioned concerning his daily activities and his physical limitations," the ALJ failed to "fulfill his duty to develop fully the record"); *Vaca*, 2010 WL 821656 at * 7 (where ALJ's questioning of Plaintiff was "perfunctory, cursory and not designed to explore the complexities of" his impairments, the ALJ failed to fulfill his duty to develop the record). However, "[a]n ALJ is under no obligation to solicit cumulative testimonial or documentary information when the record contains adequate information to permit the ALJ to render a decision." *Ortiz*, 2010 WL 2927179 at * 7 (citing *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007)).

The Court finds the ALJ satisfied his duty to fully develop the record.  The transcript indicates the ALJ asked Taylor numerous questions about the nature of her disability, daily activities, attempts to find work, living arrangements, education, and social functioning.  (Tr. 297-306.)  He asked open-ended questions and followed up with more detailed questions seeking clarification and explanation of her answers.  *See e.g.* Tr. 297, 303-304.  At the conclusion of his questioning, he asked Taylor whether "there [was] anything else that you want to tell me about your case," to which she replied "no."  (Tr. 306.)  Further, the ALJ indicated he would keep the record open for two weeks to give her the opportunity to submit anything else she felt he should consider in making his decision, explaining that "[e]ven if, say, for example you wish you had told me something and you forgot to bring it up and now your hearing is over and you didn't get a chance to tell me, it would be okay if you want to write that in a letter to me, okay, tell me anything else you want me to consider."  (Tr.311-312.)  Finally, after the hearing, the ALJ

sought the opinions of ME Lesyk regarding the nature and scope of Taylor's mental impairments and functional limitations.  (Tr. 16, 283-290.)  The ALJ was not required to do so, and appears to have taken this step for the precise purpose of developing the medical record.

While the record indicates Taylor had limited intellectual functioning, she does not cite to any particular testimony suggesting she did not understand the questions asked by the ALJ; was unable to formulate coherent responses; or, was incapable of submitting supplementary information after the conclusion of the hearing.  To the contrary, the transcript indicates Taylor testified without apparent difficulty and responded appropriately to the ALJ's questions.  Moreover, the record indicates that Taylor did, in fact, submit written responses to the ME's post-hearing interrogatories.

Taylor makes much of the fact that her hearing was only 35 minutes long and consisted of only 8 pages of testimony.  The Court finds this is not necessarily determinative of whether the ALJ fully and fairly developed the record.  As one district court from this Circuit has explained:

> An ALJ's duty to develop the record is not measured by the length of the hearing or the number of questions interposed.  Hearings should last no longer than necessary and, ideally, questions should be designed to elicit only necessary information.  Ortiz has not suggested nor has the undersigned determined that more detailed questioning or a longer hearing would have yielded information pertinent to the ALJ's disability determination. [footnote omitted].  *See Duncan*, 801 F.2d at 856.

*Ortiz,* 2010 WL 2927179 at * 7.  Similarly, here, Taylor has not adequately explained how the ALJ's questioning was deficient or identified any pertinent information that was overlooked because of the ALJ's failure to conduct a lengthier hearing.  While she claims generally the ALJ should have questioned her about the "quality of [her] daily activities, and the items he had identified in the medical record," Taylor does not identify any specific additional information that

17

she feels should have been adduced at the hearing. Nor does she explain how that information

might have changed the ALJ's decision. In the absence of any such argument, and upon careful

review of the transcript, the Court finds no indication the ALJ's questioning was superficial or

perfunctory.

Accordingly, the Court finds the ALJ did not fail to fulfill his duty to fully and fairly

develop the record.[6]

### RFC Assessment and Opinions of State Agency Physician Haskins and ME Lesyk

Taylor next argues the ALJ erred by failing to address in the RFC and hypothetical the

opinion of State Agency Physician Kristen Haskins, Psy. D., that Taylor was "capable of

understanding, remembering, and following simple instructions, performed *at a reasonable rate*

with few changes and routine expectations." (Tr. 239) (emphasis added). She also argues the ALJ

failed to offer any explanation for discounting ME Lesyk's opinion that Taylor had moderate

limitations on her ability to respond appropriately to usual work situations and changes in a

routine work setting. (Tr. 289.) She maintains the ALJ erred in failing to include this restriction

in the RFC and hypothetical.

The Commissioner argues the ALJ properly evaluated the opinions of Doctors Haskins and

Lesyk, noting their "ultimate conclusions" that Taylor could perform simple, routine work is

adequately reflected in the RFC. (Doc. No. 22 at 18.) She further argues the ALJ thoroughly

---

[6] Taylor also complains, summarily, that she "clearly had no effective way of responding to [ME Lesyk's] hand-written complex responses" to the post-hearing medical interrogatories. (Doc. No. 21 at 5.) However, the record indicates Taylor did, in fact, submit written responses to Dr. Lesyk's interrogatories. Moreover, Taylor does not indicate what additional information would have been provided in response to these interrogatories had she been represented by an attorney, or how any such information might have changed the outcome.

18

considered all of the medical evidence and formulated an RFC that is supported by substantial evidence in the record.

The RFC determination sets out an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.946(c). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the

19

claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id*. When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight. *Id.*

### Dr. Haskins

In July 2007, state agency psychologist Dr. Haskins reviewed Taylor's file and completed a mental RFC assessment. She concluded Taylor was moderately limited in her daily activities; mildly limited in maintaining social functioning; and, moderately limited in maintaining concentration, persistence or pace. (Tr. 251.) Dr. Haskins further opined Taylor was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public;

20

and, respond appropriately to changes in the work setting. (Tr. 237-38.) In addition, Dr. Haskins offered that Taylor had no marked limitations and was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to supervisory criticism; and, get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 237-238.)

In explaining the rationale for these opinions, Dr. Haskins noted that, while Taylor was alleging disability due to ADHD, she "is not receiving any treatment and is not on any medication." (Tr. 239.) Moreover, she noted Taylor "spends more than half of her time at her sister's house babysitting her two nieces;" is able to cook and do household chores; has a boyfriend; and, enjoys hanging out with friends. (Tr. 239.) Dr. Haskins acknowledged Taylor had reported difficulty concentrating, and her "cognitive functioning was though[t] to be in [the] low average range."[7] (Tr. 239.) Based on the above, Dr. Haskins concluded "Clt would be capable of understanding, remembering, and following simple instructions, *performed at a reasonable rate* with few changes and routine expectations." (Tr. 239) (emphasis added). Four months later, in November 2007, Mel Zwissler, Psy.D., another state agency psychologist,

---

[7] Dr. Haskins also acknowledged the results of Taylor's IQ testing; i.e. full-scale IQ scores of 53 at age 13, and 64 in June 2007. However, Dr. Haskins noted that both scores were thought to be an underestimate, due either to her "lack of effort" or the fact that she "worked hastily and gave up easily." (Tr. 239.) In so finding, Dr. Haskins relied on the WAIS-III testing and Disability Assessment Report completed by consultative examiner Mitchell Wax, Ph.D. in June 2007. (Tr. 231-236.) In his Report, Dr. Wax noted that Taylor's full-scale IQ score was in the mentally retarded range, but deemed that score "suspect, as [she] appeared to be functioning at a much higher level than test results indicate." (Tr. 233.) Taylor does not contest this finding.

21

reviewed Taylor's file and concurred that she could perform simple, routine work. (Tr. 256-258.)

After reviewing Taylor's testimony and the medical evidence, the ALJ considered Dr. Haskins' opinion as follows:

> The State Agency reviewed the claimant's case [and] prepared a mental residual functional capacity assessment and a psychiatric review technique form on July 5, 2007. The State Agency determined that the claimant is capable of understanding, remembering, and following simple instructions, performed at a reasonable rate with few changes and routine expectations. (Exhibit 6F). The State Agency also determined that the claimant has moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Exhibit 7F). The State Agency assessment of the claimant's residual functional capacity is generally consistent with the evidence of record and given great weight. Also, great weight is given to the moderate difficulties in concentration, persistence, or pace. However, its finding concerning the claimant's restriction of activities of daily living is unsubstantiated and given little weight.

(Tr. 22.) The ALJ then formulated the RFC as follows: "After careful consideration of the entire record, the undersigned finds that since July 1, 2007, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to understanding, remembering, and carrying out simple instructions and performing repetitive tasks throughout the day." (Tr. 20.)

Taylor contends that, while the ALJ purports to give "great weight" to Dr. Haskins' opinion, the concentration, persistence, or pace restrictions set forth in her July 2007 Mental RFC were omitted from both the RFC and the hypothetical question. Taylor relies on the Sixth Circuit's decision in *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010), to support her argument. In *Ealy*, the Sixth Circuit was confronted with a situation where the ALJ ascribed significant weight to the opinion of a state agency psychological consultant, yet omitted that same consultant's opinion that the claimant could only perform "simple repetitive tasks for

22

two-hour segments over an eight-hour day where speed was not critical." *Id.*  Conversely, the

Commissioner argues the facts in *Ealy* are distinguishable from the case at bar because that

claimant was ascribed specific speed and pace-based limitations that are not present here.  (Doc.

No. 22 at 19).

 As this Court understands Taylor's argument, she believes the RFC and hypothetical,

which limited her to work involving simple instructions and performing repetitive tasks, were

insufficient to convey the moderate difficulties she had with respect to *pace*.  The phrase

"concentration, persistence, or pace" is derived from the express language of the listings dealing

with mental impairments.  It is one of the four categories of criteria used to assess a claimant's

functional limitations.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(C).  When

comparing a claimant's mental impairments with the listings at Step Three, an ALJ will usually

determine whether a claimant has moderate, marked, or extreme limitations in the four

categories.  Notably, the criteria concerning limitations in "concentration, persistence, or pace"

is written in the disjunctive.  Taylor's argument is premised on the assumption that the ALJ

found she was moderately limited in **all three** areas, including pace.  This assumption, however,

is without basis.  "As a preliminary matter, it is significant to note that the ALJ did not

necessarily attribute all three impairments—deficient concentration, persistence, and pace—to

[claimant].  The classification is written in the disjunctive." *Brachtel v. Apfel*, 132 F.3d 417, 421

(8th Cir. 1997).  In *Brachtel*, the Eighth Circuit explained that even though an ALJ finds

limitations in the category of concentration, persistence or pace, the ALJ is "not necessarily

making a finding that the claimant has all three of these impairments." *Id.*  Courts within this

District have reached a similar conclusion.  *See e.g. Kline v. Astrue,* 2013 WL 1947164 (N.D.

23

Ohio April 17, 2013) report and recommendation adopted, 2013 WL 1946201; *Schooley v. Astrue*, 2010 WL 5283293 at * 2 (N.D. Ohio Dec. 17, 2010).

Here, in limiting Taylor to work involving simple instructions and repetitive tasks, the ALJ appears to have accepted that Taylor was impaired in her ability to maintain attention. There is no indication, however, the ALJ credited any evidence with respect to difficulties maintaining pace. While Dr. Haskins opined generally that Taylor is limited to performing work at a "reasonable rate," there is no indication the ALJ accorded "great weight" to this particular opinion. *See e.g. Lambert-Newsome v. Astrue*, 2012 WL 2922717 at * 6 (S.D. Ill. July 17, 2012) (noting the fact that the ALJ gave great weight to an opinion "does not mean he was required to adopt it wholesale"); *Irvin v. Astrue*, 2012 WL 870845 at * 2-3 (C.D. Cal. March 14, 2012) (finding that although the ALJ gave great weight to a medical source opinion, he did not err in implicitly rejecting one limitation from that opinion). Moreover, it is not clear what Dr. Haskins meant by the term "reasonable," particularly as that term would apply to a functional pace-based limitation. Dr. Haskins does not offer any further explanation for her use of this term. Significantly, she does not opine Taylor is limited in her ability to perform work involving high production rates or quota-based work, nor does Taylor direct this Court's attention to any other treating or state agency physician opinion finding such a limitation.

Given this lack of evidence and reading the decision as a whole, this Court does not believe the ALJ found Taylor had moderate pace-based limitations. Because an ALJ is only required to incorporate in the RFC or hypothetical those limitations that he or she accepts as credible, the ALJ did not err by omitting pace-based restrictions.

24

***Dr. Lesyk***

Taylor also argues the ALJ failed to offer any explanation for omitting, from both the RFC and the hypothetical, Dr. Lesyk's opinion that Taylor had moderate limitations in her ability to respond appropriately to usual work situations and changes in a routine work setting.  The ALJ considered Lesyk's opinion as follows:

> On February 13, 2010, Carolee K. Lesyk, Ph.D., completed a medical interrogatory based on the claimant's case file.  Dr. Lesyk diagnosed the claimant with ADHD, psychotic disorder, and low IQ.  Dr. Lesyk determined that the claimant has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Also, Dr. Lesyk opined that the claimant has mild limitation in ability to understand and remember simple instructions, to carry out simple instructions, and to make judgments on simple work-related decisions.  The claimant also has moderate limitation in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.  Socially, the claimant has mild limitation in ability to interact appropriately with the public, usual work situations and to changes in a routine work setting.  Lastly, Dr. Lesyk concluded that the claimant is capable of simple routine work.  (Exhibit 14F).  The opinion of Dr. Lesyk is consistent with the evidence of record and is given great weight.

(Tr. 22-23.)

As noted *supra*, the ALJ formulated an RFC that limited Taylor to understanding, remembering, and carrying out simple instructions, and performing repetitive tasks throughout the work day.  (Tr. 20.)  While the ALJ did not specifically address or incorporate Dr. Lesyk's opinion regarding Taylor's moderate limitations in her ability to respond to usual work situations and changes in a routine work setting, he was not required to do so.  *See White v. Comm'r of Soc. Sec.*, 2013 WL 4817673 at * 16 (N.D. Ohio 2013) (noting that "[t]he fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself"); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133 at * 11 (N.D.

25

Ohio March 19, 2013) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given great weight").  Nor was he required to adopt this particular opinion of Dr. Lesyk by virtue of the fact that, overall, he gave Dr. Lesyk's opinion great weight.  *See Lambert-Newsome,* 2012 WL 2922717 at * 6; *Irvin,* 2012 WL 870845 at * 2-3.  While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved for the Commissioner.  *See* 20 C.F.R. § 416.945(a).  Here, the ALJ explained the weight he attributed to Dr. Lesyk's opinion and, in fact, adopted most of the limitations set forth in her opinion by formulating an RFC that restricted Taylor to simple, routine work.  In crafting the RFC, the ALJ thoroughly discussed Taylor's hearing testimony, the relevant medical evidence, and opinion evidence from five separate physicians.  (Tr. 20-23.)  The RFC is supported by substantial evidence in the record, most notably the opinions of Doctors Haskins, Zwissler, Lesyk, and Wax that Taylor is capable of performing simple, routine work.  (Tr. 20-23; 235; 239; 258; 287.)

Accordingly, the Court finds the ALJ did not err in failing to expressly address, or include in the RFC, Dr. Lesyk's opinion that Taylor had moderate limitations in her ability to respond appropriately to usual work situations and changes in a routine work setting.

### Opinion of Dr. Haglund

Lastly, Taylor argues the ALJ erred in failing to address one of the opinions articulated by Thomas J. Haglund, Ph.D.  In her Brief on the Merits, Taylor identifies Dr. Haglund as an "examining psychologist."  The entire sum of her argument is as follows:

> Examining psychologist Dr. Haglund reported that claimant has 'struggled with poor attention, impulsivity, and distractedness. . . With respect to school and

26

> work, Stephanie will need vocational counseling and/or academic support to help
> her overcome her deficits.,' Tr. 282. The decision mentioned other opinions by
> Dr. Haglund, but not this one. The vocational expert testified that if 'the person
> would need a job coach' it would eliminate competitive employment, Tr. 310.
> The decision did not explain whether claimant would need accommodated
> supports like vocational counseling or academic support.

(Doc. No. 21 at 8.)

In her Reply Brief, Taylor argues, for the first time, that Dr. Haglund is her "main treating

source" and that the Commissioner does "not deny that Dr. Haglund was the treating psychologist

with a longitudinal perspective." (Doc. No. 24 at 4.) As one district court within this Circuit has

explained:

> It is well established that a reply brief is not the proper place to raise new
> arguments. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008);
> *Rush v. Illinois Cent. R.R. Co.*, 399 F.3d 705, 727 n. 19 (6th Cir. 2005); *United
> States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002); *United States v. Crozier*,
> 259 F.3d 503, 517 (6th Cir. 2001). A reply brief is the plaintiff's opportunity to
> respond to arguments raised for the first time in the defendant's brief. A plaintiff
> cannot wait until the reply brief to make new arguments, thus effectively
> depriving the opposing party of the opportunity to expose the weaknesses of
> plaintiff's arguments. *Scottsdale*, 513 F.3d at 553.

*Swartz v. Comm'r of Soc. Sec.*, 2008 WL 2952021 at * 5 (W.D. Mich. July 29, 2008). *See also*

*Glenn v. Astrue*, 2010 WL 4053548 at ** 10, 17 (S.D. Ohio August 13, 2010) (stating that court

would not consider arguments or allegations of error first raised in a party's reply brief).

Likewise, this Court will not consider Taylor's apparent position, raised for the first time in her

Reply Brief, that Dr. Haglund is a treating source and, therefore, the ALJ was required to give

"good reasons" for discounting his opinion.[8]

---

[8] The Court further notes that Taylor has not directed this Court's attention to any documents in
the record suggesting Dr. Haglund was her "treating psychologist with a longitudinal
perspective." The only record citation provided by Taylor with respect to Dr. Haglund is to a
single Psychological Evaluation, performed by him on two dates in October and November

There is a general order of preference to first give greater weight to the opinion from a treating physician followed next in line by an opinion from a non-treating examining physician. *See Ealy*, 594 F.3d at 514; *Rogers*, 486 F.3d at 245; 20 C.F.R. §§ 404.1527(c)(1–2) & 416.927(c)(1–2) (defining "Examining relationship" and "Treatment relationship").  As noted above, this Court does not consider Dr. Haglund a treating source under the regulations.  An ALJ must give "good reasons" for the weight given to a treating physician's opinion, 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.2007) ("Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits.").  However, with regard to non-treating, but examining sources, such as Dr. Haglund, "the agency will simply '[g]enerally [ ] give more weight to the opinion of a source who examined [the claimant] than to the opinion of a source who has not examined'" her.  *Ealy*, 594 F.3d at 514.  Notably, the procedural "good reasons" requirement does not apply to non-treating physicians.  *Smith*, 482 F.3d at 876 (explaining that  "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting their reports").

The record reflects Dr. Haglund evaluated Taylor on October 22 and November 20, 2009 due to her report of experiencing "visual hallucinations on two occasions a year ago and because she needed a psychiatric assessment."  (Tr. 278.)  During the assessment, Taylor reported she had not experienced any hallucinations since the initial episodes.  (Tr. 278.)  Dr. Haglund summarized

---

2009.  Taylor makes no argument, either through citation to the record or pertinent case law in this Circuit, to support her summary assertion that Dr. Haglund qualifies as a treating source.

28

Taylor's school records, noting they showed she had "negligible" academic skills, cognitive problems, social problems, inattention, impulsiveness, and emotional lability. (Tr. 279.) WAIS-III intelligence testing conducted as part of Dr. Haglund's evaluation yielded a Full Scale IQ of 56. (Tr. 280.) He noted that "[c]learly she is of sub-average intelligence." (Tr. 281.) Taylor reported she had difficulty concentrating, talked too loudly, and could not sit still. (Tr. 280.) While Dr. Haglund noted Taylor "did not appear restless during the interview," he concluded she struggled with poor attention, impulsivity, and distractedness. (Tr. 280, 282.) He opined medication might help to improve Taylor's attention span. Further, he noted that "[w]ith respect to school and work, [Taylor] will need vocational counseling and/or academic support to help her overcome her deficits." (Tr. 282.) He did not recommend treatment for her reported visual hallucinations. (Tr. 282.)

> The ALJ considered Dr. Haglund's opinion as follows:
>
> The claimant was assessed in October 2009 and November 2009 at the Nord Center. During the course of the assessments, the claimant underwent IQ testing which revealed a full scale IQ score of 56. Psychologist Thomas J. Haglund, Ph.D., indicated that the claimant has difficulties dealing with stress as well as cognitive and behavioral problems. Dr. Haglund stated that counseling and medication may help the claimant improve her deficits. As for the alleged hallucinations, Dr. Haglund noted that they have not reoccurred since a year ago and it is difficult to pinpoint their cause. For this reason, Dr. Haglund did not recommend treatment for a psychotic disorder at that time unless and until the hallucinations returned (Exhibit 13F/5). Little weight is given to Dr. Haglund's conclusion. Dr. Haglund discusses the claimant's impairments generally and fails to provide any specific functional limitations. Moreover, the IQ score is inconsistent with the evidence of record which shows that the claimant has a higher functional capacity.

(Tr. 22.)

The ALJ's decision fully complies with the procedural requirements set forth by the regulations as they pertain to non-treating, examining physicians. Although the ALJ did not

directly address Dr. Haglund's opinion that Taylor would need vocational counseling, the decision makes sufficiently clear that Haglund's report was fully considered and found not to be supported by the medical evidence.  The ALJ's observation that Dr. Haglund failed to discuss Taylor's impairments with any specificity is not unreasonable, nor is his conclusion that Taylor's low IQ score is "inconsistent with the evidence of record."  Simply put, the ALJ's decision satisfies the explanation requirement of the regulations.  While Taylor apparently desires a *de novo* review of Dr. Haglund's opinions, it is not this Court's function to do so.  Moreover, although the opinions of examining physicians are generally given more weight than those of non-examining medical sources, it is not *per se* error for an ALJ to favor the opinions of examining physician Wax and nonexamining physicians Haskins, Zwissler, and Lesyk, especially where the ALJ explained his reasoning.

As the ALJ properly assessed the aforementioned opinions and explained his reasons for the weight ascribed to each, Taylor's argument is without merit.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: November 22, 2013